(No. 13949.—Judgment affirmed.)

THE COLUMBIAN CIRCLE *vs.* ANNA MUDRA *et al.*—(JOSEPH
K. KROUPA, Appellant, *vs.* ANNA MUDRA, Appellee.)

*Opinion filed June 22, 1921—Rehearing denied October 7, 1921.*

BENEFIT SOCIETIES—*when assured cannot change beneficiary.*
Equitable rights may be acquired in a beneficiary certificate which
a court of equity will recognize and enforce, and if the assured
delivers his certificate to the beneficiary upon an agreement that
she pay the premiums, the assured, after the beneficiary has sub-
stantially complied with the agreement, has no right to change the
beneficiary without her consent.

APPEAL from the Second Branch Appellate Court for
the First District;—heard in that court on appeal from the
Superior Court of Cook county; the Hon. DENIS E. SUL-
LIVAN, Judge, presiding.

EDWARD J. SMEJKAL, and JOSEPH Z. KLENHA, for
appellant.

LIGHTHALL, DANKOWSKI & CARLSON, (C. OSCAR CARL-
SON, of counsel,) for appellee.

Mr. CHIEF JUSTICE STONE delivered the opinion of the
court:

On March 24, 1899, the order of the Columbian Knights
issued a benefit certificate to James Mudra, now deceased,
in the sum of $1000, payable at his death to Anna Mudra,
his wife. Subsequent to the issuing of this certificate the
name of the order was changed to the Columbian Circle.
Mudra applied in writing on March 13, 1916, for a new
certificate and for a change of beneficiary, stating in his
application that the original certificate had been lost and
directing that the benefits be paid as follows: To Anna
Mudra, his wife, $5; Ralph Mudra, a son, $10; Eddie

Mudra, a son, $10; Joseph Kroupa, a nephew, $775; John Mudra, a brother, $100; and Marie Mudra, a sister, $100. Pursuant to this application a new certificate was issued to him on March 20, 1916. Upon his death, June 29, 1917, appellee, Anna Mudra, claimed the full amount of $1000 under the original certificate, and appellant, Joseph Kroupa, claimed $775 under the new certificate. The Columbian Circle filed its bill of interpleader in the superior court of Cook county, in which it is admitted that $1000 is due and praying the court to determine the proper beneficiaries and the amount to be paid to each. Answers and replications were filed and the cause was submitted to a master in chancery, who took the evidence and found that the original certificate was canceled by the issuance of the second certificate, and found that the beneficiaries named in the certificate of March 20, 1916, were entitled to the proceeds thus paid into court, in the proportions set forth in the certificate. On exceptions to the master's report the chancellor found that the appellee had an equitable interest in the original certificate by reason of an agreement that she pay the dues and assessments accruing thereon and her compliance with such agreement, and decreed that the certificate dated March 20, 1916, be held null and void and the original certificate of March 24, 1899, in full force and effect, and that Anna Mudra was entitled to the entire sum accruing thereon. This decree was on review affirmed by the Appellate Court, and a certificate of importance being granted, the cause comes here on appeal by Joseph K. Kroupa.

The chancellor and the Appellate Court found that at the time of the delivery of the original certificate to James F. Mudra, the assured, he delivered it to the appellee, his wife, telling her, in effect, that she should pay the premiums and the insurance would be for her benefit; that his wife accepted the policy and agreed to keep up the payments, and that she or her son James had possession of the certificate at all times thereafter; that she, or her sons

for her, paid the premiums thereafter, with the exception of a few instances when the assured voluntarily paid them himself. The chancellor and the Appellate Court found that an agreement existed between appellee and the assured by which appellee obtained an equitable interest in the original certificate, and the second certificate having been issued without her consent, was unauthorized and in fraud of her rights and therefore void.

Appellant concedes the rule to be, that where the assured, having designated a beneficiary, delivers the policy to her on an agreement that she shall receive the proceeds thereof in consideration of her promise to pay dues or assessments on such policy and she fulfills such promise, the assured can not thereafter change the beneficiary, but he contends that the evidence does not show such agreement and the fulfillment thereof. This is the principal contention of appellant and rests upon questions of fact.

The rule in this State is, that while the assured may, in the absence of intervening equities, change at will the beneficiary named in his insurance policy, equitable rights may be acquired in a beneficiary certificate of insurance which a court of equity will recognize and enforce. (Bispham's Eq. 162; *Royal Arcanum* v. *Tracy,* 169 Ill. 123; *McGrew* v. *McGrew,* 190 id. 604.) If there was an agreement between the assured and appellee that she should receive a beneficial interest in the certificate of insurance upon and by reason of payments by her of the premiums, dues or assessments, such contract was binding on the assured and deprived him of the right to change the beneficiary without appellee's consent. Two questions of fact therefore arise: First, was there an agreement of this character between appellee and the assured? Second, if so, was that agreement complied with on the part of appellee?

James Mudra, a son, testified that prior to the taking out of the membership in the lodge there was a discussion between appellee and the deceased, and it was then agreed

COLUMBIAN CIRCLE *v.* MUDRA.     [298 Ill.

that in case he took out such certificate she should be made beneficiary. He testified, also, that when the certificate arrived at the home the deceased laid it on the table and said, "Now, mother, this is yours; you pay the premiums and look after it that these premiums are paid," and she said, "All right," and took the certificate and put it away; that thereafter the certificate remained either in the possession of appellee or of the witness; that he frequently paid these premiums for his mother, sometimes getting the money for such payments from her and at other times paying, at her request, out of his own money and thereafter settling with her. He testified that his father never gave him any money to pay the premiums but at different times advised that the premiums be kept up; that this continued even after the attempted change of beneficiaries. Bohemiul Mudra, another son, testified that he had paid premiums for his mother; that his father had said to him that it was up to the mother or the sons to pay the premiums; that if they did not want to do it the policy would lapse. He also testified that after the attempted change of beneficiaries, in March, 1916, his father inquired whether or not the premiums were being paid by appellee. Rudolph Mudra, another son, testified that he was present at the time of the conversation between appellee and the assured regarding the certificate and the payment of the premiums; that after the family had moved to the State of Nebraska, which occurred some years after the taking out of the certificate, he was advised by his father that the premiums should be kept up, and that appellee was present and declared they would be kept up. This witness paid premiums at different times on behalf of his mother and testified that he got the money from his mother; that he paid on this certificate after the purported change of beneficiaries. Antonie Mraz, a sister of the appellee, testified that after the purported transfer, in March, 1916, the assured frequently called at her house during the times when he was not living at home and asked

her to send word to appellee to be sure and make payments on the premiums.

Appellee testified that at the time she married the assured she had money of her own; that the two together bought property in the city of Chicago which they afterward sold, and she received as her share the sum of $1100 for the property. She testified that she paid the premiums and was careful to see that they were paid; that she paid them every month; that while he once in a while paid them, such payments by him were wholly voluntary on his part; that she did not request that he do so; that nobody paid them for her at her request; that while her three sons were at home they gave their earnings to her and continued to do so prior to their marriage, and that while she sent the premiums by her sons, it was her money that paid them.

Appellee stated in her testimony that her husband gave her the certificate for safe keeping, and counsel for appellant contend that this proves there was no contract that she should pay the premiums. It is evident from her entire testimony, however, that the expression in her testimony, "for safe keeping," which was given through an interpreter, was not intended in the technical, legal sense that she was simply the bailee of the certificate. There is no doubt from her testimony and the testimony of her three sons that all understood that there was an agreement that she should pay the dues or premiums and receive the benefit of this certificate.

Frank B. Vrenak, a witness called by appellant, testified that sometimes the assured paid dues and some of the times the sons paid them. He testified that he did not know the assured before April, 1915, and knew nothing about what payments were made, or by whom, prior to that time.

This is substantially all of the evidence in the record pertaining to the question of the existence of the agreement contended for by appellee. It shows that the certificate at all times has been in the possession of appellee or one of

her sons, though a portion of the time the assured was not living at home. It is evident that she considered it her duty to see to the payment of the premiums, and the record discloses that she either furnished the money to do so or had her sons furnish the money, and that the payments made by the assured at such times as he did make them were purely voluntary. It discloses that appellee had a source of income from her sons until they became of age and married; that while the assured, when employed, contributed to the family, he frequently drew from appellee all that he had paid her, in order to settle his personal accounts. The evidence also discloses that even after the attempted change of beneficiary the assured frequently reminded members of the family that if appellee would have the benefit of the certificate she must keep up the premiums.

It appears from the testimony of the witness Vrenak, secretary of the local lodge, that the assured told him that his old certificate could not be found and that he (the witness) issued a new certificate, with change of beneficiary. This statement was not true, since the assured knew the whereabouts of the certificate, and the record discloses that his attempted change of beneficiaries was a fraud upon the equitable rights of the appellee in the certificate of insurance. The evidence discloses that the assured, during the last four years of his life, was in the habit of staying away from home a greater portion of the time, returning for a few days or weeks and then again leaving; that he was addicted to the use of intoxicating liquors, and in the later years of his life was unable to hold positions as a result of that habit.

We are of the opinion that the evidence in this case discloses an agreement whereby appellee acquired an equitable interest in the first certificate of insurance in question and that such agreement is a valid and binding one and that she made substantial compliance therewith, and under the rule herein referred to, the assured was without right to change

the beneficiary without her consent. It follows, therefore, that the second certificate was null and void and the insurance is due upon the first certificate issued, in accordance with the terms thereof.

The judgment of the Appellate Court will therefore be affirmed.                    *Judgment affirmed.*